**In re CONTINENTAL AIRLINES COR-PORATION, Continental Air Lines, Inc. Texas International Airlines, Inc., TXIA Holdings Corporation,**

**Bankruptcy Nos. 83–04019–H2–5, 83–04020–H2–5, 83–04021–H2–5, and 83–04022–H2–5.**

United States Bankruptcy Court, S.D. Texas.

April 11, 1986.

John J. Gallagher, David P. Callet, Randall L. Sarosdy, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., for plaintiff.

Clifford H. Brown, Ervin, Cohen & Jessup, Beverly Hills, Cal., for defendant.

Myron M. Sheinfeld, Lenard M. Parkins, Sheinfeld, Maley & Kay, Houston, Tex., Harvey Miller, Bruce Zirinsky, Weil, Gotshal & Manges, New York City, for Continental Air Lines, Inc. and Texas Intern. Airlines, Inc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH RESPECT TO CLAIMS BY INDIVIDUAL EMPLOYEES FOR LABOR PROTECTIVE PROVISIONS

T. GLOVER ROBERTS, Bankruptcy Judge.

The following are facts either stipulated or established by the evidentiary record in this case in previous matters, of which the Court takes notice, and is considered a proper and adequate basis on which to make these "Findings" and "Conclusions":

### FINDINGS OF FACT

1. On August 14, 1981 the Civil Aeronautics Board ("CAB") approved the acquisition of Continental Air Lines, Inc. by Texas International Airlines, Inc. CAB Order No. 81–10–66. As a condition to its approval of the acquisition, the CAB imposed labor protective provisions ("LPPs") "to provide for compensatory allowances to employees who may be affected by the proposed acquisition." Order No. 81–10–66. Section 1 of the LPPs states:

> The fundamental scope and purpose of the conditions hereinafter specified are to provide for compensatory allowances to employees who may be affected by the proposed acquisition by Texas International Airlines, Inc. (TI) of Continental Air Lines, Inc. approved by the attached order, and it is the intent that such conditions are to be restricted to those changes in employment due to and resulting from such acquisition. Fluctuations, rises and falls, and changes in volume or character of employment brought about by other causes are not covered by or intended to be covered by these provisions.

The LPPs provided three basic types of compensation for changes in employment "due to and resulting from" the acquisition: (1) a displacement allowance for those employees who received lower compensation; (2) a dismissal allowance for those employees whose jobs were abolished; and (3) relocation expenses for those employees who were forced to move.

2. Pursuant to the CAB's authorization, Texas International consummated its acquisition of Continental on October 12, 1981. During 1982, Continental and Texas International began to integrate their operations. On October 31, 1982, the two carriers implemented a corporate reorganization and an operational merger under the name "Continental." The employees, routes, flight schedules, and fleets were combined as one operation. The employees in each class were combined under the representation of single unions. In accordance with the LPPs, many employees who lost their

jobs or who received reduced wages as a result of the acquisition applied for and received the prescribed LPP benefits.

3. On September 24, 1983, Continental filed a petition for reorganization under Chapter 11 of the United States Bankruptcy Code. Upon filing the bankruptcy petition, Continental temporarily suspended all domestic service, requiring commensurately fewer employees. The active employees worked under "emergency work rules" and were generally paid lower wages and benefits than they had received before the filing of the petition. In response to Continental's implementation of the emergency work rules and Continental's motion to reject its pre-petition labor contracts, the Air Line Pilots Association, International ("ALPA") and the Union of Flight Attendants ("UFA") called strikes which began October 1, 1983.[1] The ALPA strike was terminated on October 31, 1985. The UFA strike was terminated on April 17, 1985 when the union instructed its members to offer unconditionally to return to work.

4. Prior to the termination of any strikes, however, this Court approved, after an extended trial, Continental's motion to reject its collective bargaining agreements with ALPA (Order of June 19, 1984), the IAM (Order of June 26, 1984) and the UFA (Order of December 5, 1984). Each contract rejection is retroactive to September 24, 1983.

5. In the ensuing claims proceedings in this case, a large number of individual employees or former employees of Continental have filed claims for LPPs on the ground that Continental's bankruptcy was "due to and resulting from" the acquisition of Continental Air Lines, Inc. by Texas International in 1981.

6. As originally filed on April 30, 1985, Debtors' Motion requested this Court to enter summary judgment in Debtors' favor on the issue of the applicability of labor protective provisions to changes in wages and working conditions associated with the bankruptcy.

7. On June 3 and 4, 1985, ALPA and UFA filed motions pursuant to 28 U.S.C. § 157(d) seeking to withdraw the reference of this Motion from the Bankruptcy Court on grounds that Debtors' Motion "required the consideration of federal laws regulating interstate commerce," *i.e.*, the Railway Labor Act, 45 U.S.C. § 151 et seq., and the Federal Aviation Act, 49 U.S.C. § 1378, and that withdrawal of the reference was therefore mandatory. The unions' motions remain pending in the District Court.

8. Chronologically, then, on June 3, 1985, ALPA and UFA, joined by the Official Union Labor and Pension Creditors' Committee, filed a Motion to Stay this Court's consideration of the present motion pending District Court disposition of the Section 157(d) Motion to Withdraw Reference. After hearing this Court entered an Order filed July 8, 1985, denying that motion, which found, *inter alia*, as follows:

> To interpret Section 157(d) as the unions propose would disrupt the claims procedure so carefully crafted in the Bankruptcy Code, by bifurcating the claims resolution process between the District Court and the Bankruptcy Court. As a practical matter, such a result would be intolerable. Not only would the Bankruptcy Court be abandoning a statutorily-charged responsibility, but it would be thrusting upon the District Court additional litigation in an already overcrowded arena, a scenario that is not only costly and time consuming, but also a ridiculously circuitous route in the bankruptcy case administration process.

Order filed July 8, 1985 at 4–5.

9. Subsequently, on July 16, 1985, Debtors filed a Motion To Estimate All Contingent Or Unliquidated Employee Claims For Purposes Of Confirmation Pursuant To Bankruptcy Code Section 502(c) and to Convert Pending Motions For Summary Judgment To Motions To Estimate The Value Of

---

1. The International Association of Machinists and Aerospace Workers ("IAM") had been on strike since August 13, 1983.

Claims. While Debtors' position denying all liability for such claims had not and has not changed, Debtors' proposed procedures changed because, according to the Debtors, only the estimation process could produce allowance of claims for Plan purposes in a time frame sufficient to avoid delay in the closing of this case.

10. On June 25, 1985, this Court entered an Order granting Debtors' Motion for Extension of the Exclusivity Period up to September 5, 1985 upon the express condition that no further extensions would be granted and that the Debtors would, in fact, file a proposed Plan of Reorganization on that date. A plan was later filed, along with a disclosure statement; the latter of which has been approved by this Court.

## CONCLUSIONS OF LAW

■ 1. The Court is satisfied that it has jurisdiction to resolve on the merits the liability issues presented by the present motion, for the motion does not require direct interpretation or application of the statutory language of the Railway Labor Act or any other federal statute regulating interstate commerce, and therefore § 157(d) of the 28 U.S.C. is deemed inapplicable here. The question here rests squarely in the bankruptcy claims adjudication process.

2. Use of the estimation procedure by this Court will allow the Debtors' Reorganization Plan to proceed without unnecessary or costly delay to the Debtor or creditor groups who may have reached agreement relative to debt repayment. The estimation procedure can, however, be simplified by resolution of the summary judgment issues now on file by the Court's review of undisputed facts and facts previously established in the case, and application of the appropriate law.

3. Bankruptcy Courts clearly have jurisdiction to decide all claims against an estate. 28 U.S.C. §§ 1334(a); 157(a), (b)(1), (b)(2)(B). The Bankruptcy Reform Act of 1978 [S]ignificantly expands the jurisdiction of bankruptcy courts and is based on the notion that to protect the positions of both the bankrupt and its creditors, bankruptcy actions should not be subject to unnecessary delay and all claims and issues relevant to such actions should be resolved in one expeditious proceeding.

### LPPs Were Not Intended To And Do Not Apply To Bankruptcy-Related Changes In Employment

■ 4. Turning now to the LPP issue, the Court concludes that by their own terms, the LPPs were not designed to ensure employees against any and all economic changes or conditions that in some way adversely affect their employment. As noted above, the LPPs do not cover "[f]luctuations, rises and falls, and changes in volume or character of employment" brought about by causes not "due to and resulting from such acquisition." *See supra* at 485.

5. In imposing LPPs the CAB consistently held that they were intended to cover only changes in employment which are "fairly attributable to the merger." *Allegheny-Mohawk Merger*, 59 CAB 19, 36 (1972). The only changes which the CAB historically considered "fairly attributable to a merger were those which stem from the combination of work forces and consequent reduction in duplicative functions. LPPs were meant to alleviate the particular effects of a merger itself, such as abandonment of duplicative routes, consolidation of facilities, or the unique problems of putting together two work forces, in recognition of the fact that "[i]n merger cases there are inherent problems with duplicative work and the integration of seniority lists ..." *Aloha Airlines Control by IASCO*, CAB Order 78-6-208, at 15. In contrast, where there is no such concern about duplicative routes and facilities or redundant work forces, LPPs have not been imposed at all. *Id.* Thus LPPs were never intended "for the purpose of protecting employees against consequences of mere changes in management policy, company organization, or operating methods," but were designed only to cover changes in employment that flow *directly* from a merger or acquisition.

*Hughes Tool Co., Acquisition of Air West,* 53 CAB 32, 44 (1969). *Accord, North Atlantic Route Transfer Case,* 12 CAB 124, 130 (1950); *Flying Tiger Corp. Reorganization,* 54 CAB 699, 703 (1970); *Airlift-Slick Employee Integration,* 48 CAB 958, 960 (1968); *Alaska International Air, Inc., Acquisition of Great Northern Airlines, Inc.,* CAB Order 80-8-83.

6. Significantly, the CAB consistently refused to impose LPPs on bankrupt carriers. For example, the CAB declined to impose LPPs when it approved a Braniff-PSA agreement which would have permitted the post-bankruptcy Braniff to restructure in a joint venture with PSA. In the face of the objection of Braniff unions to CAB approval without LPPs, the CAB concluded that LPPs might undermine the economic stability of the carriers and further undermine Braniff's reorganization effort because the Braniff and PSA joint venture might not go forward if LPPs were imposed. *Braniff-Pacific Southwest Agreement Exemption,* CAB Order 83-2-72. Likewise, the CAB refused to impose LPPs after the bankrupt Universal lost its route authority and another air carrier obtained Universal's authority and aircraft. *Universal-Saturn,* 60 CAB 951, 953 (1972). Although the Non-Union Labor Committee argues that imposition of LPPs is different from enforcement of LPPs, it has not pointed to one case in which LPPs have been enforced with respect to bankruptcy related changes in employment. In the only context in which the CAB has considered the application of LPPs to changes in employment due to the possible failure of a carrier, i.e. when it has considered the imposition of LPPs, the CAB has held that LPPs do not apply.

7. The Non-Union Labor Committee has argued that LPPs were imposed, and apply here, because of anticipated bargaining difficulties between Continental and the unions. Non-Union Labor Committee brief, filed July 28, 1985, at 7-10. The Court finds this argument unpersuasive. First, this Court has already held that Continental "made considerable and reasonable effort to reach agreement with the unions involved ... for voluntary modification of their respective bargaining agreements" and "that Continental has bargained in good faith with respect to those efforts." Opinion dated August 17, 1984, at 12-13. Second, such an inquiry would involve the Court in second guessing management decisions taken during the collective bargaining process—"If only Continental had offered x instead of y, then maybe the unions would have agreed." This type of speculation is prohibited by the LPPs themselves, which are not intended to protect employees from the consequences of "change in management policy, company organization or operating methods." *Hughes Tool Co., Acquisition of Air West,* 53 C.A.B. 32, 44 (1969). The Court should not, and under the LPPs may not, speculate as to whether the Continental bankruptcy would have occurred if different parties had been involved or if the parties had conducted their negotiations differently.

8. The Non-Union Labor Committee also claims that Judge Kane determined that the combined company would require union concessions and it is for this reason that he imposed the LPPs. This argument is both factually and legally incorrect. In fact, both the decisions of Judge Kane and the CAB support the position that LPPs do not apply to the present situation. First, Judge Kane did *not* impose LPPs in response to arguments made by the unions opposing Texas International's bid. Prior to the time of his decision, Texas International had voluntarily accepted LPPs. *See* CAB Order, 81-5-151. Second, the Continental pilots, apparently also recognizing that the traditional LPPs should be adopted to forestall what they imagined would be the consequences of Texas International's management policies and operating methods. As proposed by the pilots, the LPPs would apply unless Texas International could affirmatively prove that the adverse employment consequences were *not* "due to and resulting from the acquisition." Judge Kane refused to make the change and held:

The Continental pilots contend that if the acquisition is approved the public interest requires that the LPPs be substantially improved by placing the burden on the carrier to establish that any adverse change in employment is *not* "due to and resulting from the acquisition." The burden is presently upon the employees to make the affirmative showing. The Continental pilots are also concerned over the survivability of their existing labor agreement and contend that it will be in the public interest to add an additional section to the LPPs which provides that such agreements shall continue in full force and effect and be binding upon the carrier until such time as any representational disputes are resolved by the National Mediation Board and new working agreements have been negotiated under the Railway Labor Act. The need for either of these conditions has not been shown. The Board has agreed to impose the standard labor protective provisions in this case. However its policy of imposing such provisions only in "extraordinary circumstances." There has been no such showing in this case.

Recommended Decision of Judge Kane, July 15, 1981, at 58–59 n. 31. In considering the same issue the CAB held:

> We will deny the requests that the burden be placed on the company to establish that changes in employment were not caused by the acquisition and that the new carrier be compelled to honor previous collective bargaining agreements. By asking that the Board shift the burden of proof and interfere with the collective bargaining process, the Continental Pilots are seeking to significantly modify the LPPs, which we decline to do.

Order 81–10–66, at 14. It is thus clear that both Judge Kane and the CAB, as well as the parties involved in the acquisition proceeding, recognized that LPPs do not apply to management decisions, including decisions relating to labor negotiations.

9. Finally, the CAB expressly refused to adopt Judge Kane's findings that "Conti-

nental's financial position after the merger would be weak and its labor relations ... stormy," and held:

> We concur with Judge Kane's ultimate determination that the labor arguments which have been raised by the opponents in this proceeding are either unproven or not sufficient to warrant disapproval of TI's proposed acquisition. However, we conclude that some of Judge Kane's subsidiary findings about TI's labor policies, intentions and plans go beyond our jurisdiction and we do not adopt them.

Order 81–10–66, at 11. The CAB's determination that Judge Kane had acted beyond the scope of his jurisdiction in examining TI's labor policies confirms further that LPPs were not imposed because of any concern about future labor negotiations. In fact, the Board made the following comments on Judge Kane's findings concerning TI's labor policies:

> Although this proposed acquisition has been characterized by unusual acrimony, any acquisition is likely to create uncertainty and a certain amount of dislocation. Carrier management in the process of its labor negotiations should be able to vigorously pursue its objectives and seek greater employee productivity; otherwise, the process could not accurately be described as bargaining. Indeed, a strong argument can be made that even if Continental were not acquired, it would be under pressure to make these changes anyway in order to remain competitive.

Order 81–10–66, at 12 n. 22.

10. In refusing to adopt Judge Kane's findings and ALPA's request that it expand the scope of the LPPs, the CAB indicated that it did not intend the LPPs to apply beyond the traditional, narrow circumstances in which they have always applied, i.e. to protect employees from changes in employment caused by the integration of the routes and work forces or the elimination of duplicative services. The Board was also satisfied that the financial condition of the combined airline would not jeopardize employee interest in a manner

contrary to the public interest. Order 81–10–66, at 13, n. 24. Had the CAB intended LPPs to apply to changes in employment caused by a bankruptcy or other financial crisis, it presumably would have modified the LPPs to reflect such a drastic departure from prior CAB policy or, at a minimum, it would have accepted the modification proposed by ALPA. Instead, it chose to impose only the standard LPPs, applicable only to employment changes caused by the operational integration of two carriers. Accordingly, the LPPs imposed by the CAB as a condition of Texas International's acquisition of Continental do not extend beyond the changes caused by the integration of the work forces and the elimination of duplicative services. They were never intended to apply to the economic dislocations resulting from a bankruptcy or other financial crisis.

11. In fact, the Non-Union Labor Committee recognizes that "the CAB has not imposed LPP liabilities on bankrupt carriers." Non-Union Labor Committee brief, at 9. And a group of 95 non-union employees who have opposed Continental's motion "agree that LPPs are not intended to apply to bankruptcy-related changes in employment." Non-Union Employee Creditors' brief, at 8.

12. The fact that LPPs do not apply to bankruptcy-related changes in employment does not necessarily leave the individual employees and former employees of Continental without a forum for their claims. In Section 43 of the Airline Deregulation Act, 49 U.S.C. § 1552, Congress established a comprehensive employee protection program for the benefit of employees whose jobs are terminated as a direct result of airline deregulation. The act specifically provides for employee protective provisions in the event of an airline bankruptcy caused by deregulation. *See Braniff Master Executive Council v. CAB*, 693 F.2d 220, 228 (D.C.Cir.1982). It appears that if the individual employees and former employees have any claims for employment disruptions related to Continental's bankruptcy, they should be brought under that provision. Indeed, ALPA has already rec-

ognized this fact by filing a claim for employee protective provisions in which it stated that the "total loss of employment or severe wage reductions suffered by the Continental pilots resulted directly from increased competition caused by airline deregulation." Application of ALPA for Determination of Qualifying Dislocation, filed October 13, 1983. And the IAM has filed a similar claim in which it stated that, "It cannot be asserted as some have recently done that the financial plight of the airline industry is due to factors other than deregulation, such as high fuel costs, inflation, a severe recession, and the lockout of PATCO controllers by the Federal Aviation Administration." Answer of International Association of Machinists and Aerospace Workers to Application for Determinations of Qualifying Dislocation, filed September 7, 1983, at 8–9. Accordingly, as a matter of law, the LPPs do not apply to the bankruptcy-related changes in employment for which the individual employees and former employees seek compensation in this Court.

*This Court Has Already Determined That The Continental Bankruptcy Was Caused By Competitive Forces Resulting From Deregulation, Including the Effects of Continental's High Labor Costs, and Not By The Acquisition of Continental By Texas International*

13. In its order rejecting Continental's contract with ALPA, this Court held:

These losses [$521.9 million] were caused primarily by Continental's inability to compete with new entrants coming into the airline industry. The principal reason for its inability to compete was that its labor costs were significantly higher than the new entrants.

Findings of Fact, ¶ 6, August 17, 1984. This Court has thus already determined that the primary causes of Continental's bankruptcy were the effects of deregulation and Continental's high labor costs.

14. Under the applicable legal standard there is an insufficient nexus between the

acquisition and the bankruptcy to trigger any LPP benefits. That legal standard has recently been clarified by the CAB, and affirmed by the Eleventh Circuit, in *Pan Am-Acquisition of, Control of and Merger with National Airlines,* CAB Order 83–5–99, *affirmed sub nom. Wallace v. CAB,* 755 F.2d 861 (11th Cir.1985). In reversing an arbitrator's award of LPPs in that case, the CAB held:

> Even if the record contained some support for his citation of Pan Am's postmerger problems, he himself recognized that Pan Am's problems had several other causes as well, such as escalating fuel prices and competition from new entrants
>
> .    .    .    .    .
>
> The LPPs do not require a carrier to pay a dismissal allowance where the merger is only one of several factors creating the loss.

Order 83–5–99, at 14–15. Thus, under the applicable CAB precedent it is not enough that the acquisition is simply "a cause" of the bankruptcy; it must be "a sufficiently important cause to bring the LPPs into play." *Id.* at 13. As the Non-Union Labor Committee notes, the "merger and acquisition" must be "one of the materially causative factors bringing about the dismissal, displacement or dislocation of employees." Non-Union Labor Committee memorandum, at 11.

15. This Court has already determined that the principal cause of the bankruptcy was caused by Continental's inability to compete with other airlines because of its high labor costs. These are the "material causative factors" of the bankruptcy. Because of these prior determinations it is clear that, under the applicable legal standard, there cannot be a legally sufficient nexus between the acquisition and the bankruptcy to permit the award of any

LPPs. Even if the acquisition were somehow related to the bankruptcy, it is at best "only one of several factors creating the loss," and therefore the "LPPs do not require a carrier to pay a dismissal allowance....." *Pan Am, supra,* at 15. Accordingly, the individual employees and former employees of Continental are not entitled to LPPs as a result of Continental's bankruptcy.[2]

16. In opposition to Continental's motion, and in support of their own motion for summary judgment, the group of 95 non-union employees has filed four affidavits. Considered in their most favorable light, these affidavits state nothing more than that cost reduction measures followed the merger. This is not a material fact, since the imposition of cost reduction measures following the merger does not address the causes of the bankruptcy. As the CAB noted in its order approving the acquisition:

> Indeed, a strong argument can be made that even if Continental were not acquired, it would be under pressure to make these changes anyway in order to remain competitive. The record shows that Continental as a part of its effort to restructure its operations has recently undergone a period of retrenchment during which it has sold off a portion of its DC–10 fleet, substantially cut back its operations and laid off ten percent of its labor force.

Order 81–20–66, at 12 n. 22. These affidavits therefore do not contradict or even relate to this Court's prior determination that the bankruptcy was caused by the effects of deregulation. They neither support the non-union employees' motion for summary judgment nor raise any issues of material fact in opposition to Continental's motion for summary judgment.

---

**2.** ALPA and the Union Labor Committee have argued that a "but for" or "quasi but for" test applies. ALPA brief, at 6; Union Labor Committee brief, filed July 28, 1985, at 13–14. Under that standard Continental is also clearly entitled to summary judgment, since the employees would then have to show that but for the merger the Continental bankruptcy would not have occurred. In light of the Court's finding that the bankruptcy was caused by the effects of deregulation, it is impossible to say that the bankruptcy, and resulting changes in employment, would not have occurred "but for" the merger.

## CONCLUSION

1. For all of the reasons set forth above, the Court finds that Debtors' motion for summary judgment disallowing the labor protective provision claims of individual employees and former employees of Continental who contend that the changes in employment associated with the Continental bankruptcy were "due to and resulting from" the acquisition of Continental by Texas International in 1981 should be granted, or those claims should be estimated at zero dollars.

2. This Court has previously held, and reaffirms here, that it does not believe that Continental's motion for partial summary judgment presents issues whose resolution requires the consideration of federal laws regulating activities affecting interstate commerce within the meaning of 28 U.S.C. § 157(d). Although Continental's objections to the individual claims at issue herein can in some respects be said to arise out of federal labor law, the resolution of Continental's motion has not required the interpretation of any federal statute or the balancing of competing federal policies. Recognizing, however, that the unions have filed motions to withdraw the reference of Continental's motion for the Bankruptcy Court, this Court in the interest of efficiency and economy to the Court as well as the parties hereby rules in the alternative that the value of the individual claims for labor protective provision payments on the ground that the changes in employment associated with the Continental bankruptcy were "due to and resulting from" the parties hereby rules in the alternative that the value of the individual claims for labor protective provision payments on the ground that the changes in employment associated with the Continental bankruptcy were "due to and resulting from" the merger is estimated pursuant to 11 U.S.C. § 502(c) to be zero.

These Findings of Fact and Conclusions of Law are hereby incorporated in and made a part hereof by reference the Order entered by this Court adjudicating this issue.